2023 IL App (1st) 230433-U

Fourth Division
Filed December 7, 2023

No. 1-23-0433

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | |
|---|---|
| *In re* D.D., a Minor,<br><br>    Appellee<br><br><br>(The People of the State of Illinois, Petitioner-Appellee, *v.* Desiree F. and Luis D., Respondents (Desiree F., Respondent-Appellant)). | Appeal from the<br>Circuit Court of Cook County<br><br>No. 2019 JA 01454<br><br>The Honorable Peter J. Vilkelis,<br>Judge, presiding. |

JUSTICE OCASIO III delivered the judgment of the court.
Presiding Justice Rochford and Justice Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm the judgment of the trial court. The trial court's findings that D.D. was neglected and abused were not against the manifest weight of the evidence. D.D's mother had standing to challenge the trial court's dispositional rulings making D.D. a ward of the court and transferring custody to a legal guardian, but those orders were not an abuse of discretion or against the manifest weight of the evidence, and the transcript of the trial court's oral ruling satisfied the statutory requirement of written findings.

¶ 2    On April 23, 2019, a nine-months-pregnant teenager named Marlen Ochoa[1] went missing. That same day, paramedics were called to a home on the southwest side of Chicago, where respondent-appellant Desiree F.'s mother, Clarisa, lived and where Desiree and her fiancé, respondent Luis D., frequently stayed because they had no fixed residence. At the home, the

---

[1] Marlen's last name is also given as Ochoa-Uriostegui and Ochoa-Lopez in various record materials.

paramedics found a newborn baby who was not breathing. They took the infant to Advocate Christ Medical Center, where he was admitted to the neonatal intensive care unit with a diagnosis of respiratory distress. Three weeks later, police investigating Marlen's disappearance found her partially decomposed body in a black trash can in the backyard of that same home. Clarisa and Desiree were arrested and charged in connection with the killing. The infant, whose family named him Yovanny, died in June 2019.

¶ 3    While in pretrial detention at the Cook County Jail, Desiree gave birth to a son, D.D., whose welfare is the subject of this appeal. He left the hospital in the care of his father, Luis. But one month later, the State filed a petition to have him adjudicated a ward of the court. The court later found that D.D. was neglected and abused, and it ultimately made him a ward of the court, found that Desiree and Luis were unfit and unable to care for him, and assigned legal custody of him to the Department of Children and Family Services. On appeal, Desiree challenges all of those determinations. We affirm.

¶ 4                                    BACKGROUND

¶ 5    D.D. was born on November 1, 2019. At the time, his mother, Desiree, was in custody at the Cook County Jail awaiting trial on charges related to the deaths of Marlen and Yovanny. D.D. was discharged from the hospital into the care of his father, Luis. He remained there until December 5, when the Illinois Department of Children and Family Services (DCFS) took him into protective custody.

¶ 6    On December 9, 2019, the State filed a petition for adjudication of wardship for D.D. The petition alleged that, in April 2019, Desiree had helped Clarisa (Desiree's mother and D.D.'s maternal grandmother) lure Marlen to their home under false pretenses, kill her by strangulation, and cut into her body to remove the still-living infant.[2] In the weeks that followed, Desiree and

---

[2]  The petition did not specifically name Marlen and Clarisa, referring to them as a "pregnant woman" and the "maternal grandmother," respectively. We use their actual names for clarity.

Clarisa pretended that the infant was Clarisa's son. That pretense collapsed when law enforcement personnel found Marlen's body at the home where Clarisa lived with Desiree and Luis. The infant later died due to medical complications associated with the attack. Although the petition did not allege that Luis participated in the killing, it did allege that he was at the home on the same day it occurred and that he was seen driving the victim's car afterward. The petition also alleged that Desiree had reported that Luis had committed acts of domestic violence against her, including striking her multiple times and throwing bolt-cutters at her shortly after the killing. It noted that Desiree was incarcerated on charges related to the killings of Marlen and Yovanny. Due to all of these circumstances, the petition alleged that D.D. was a neglected minor because his environment was injurious to his welfare (see 705 ILCS 405/2-3(1)(b) (West 2020)) and that he was an abused minor because a parent, an immediate family member, a person responsible for his welfare, a person in his family or household, a person who lived in his home, or one of his parents' paramours created a substantial risk of causing physical injury to him by nonaccidental means that would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of bodily function (see *id.* § 2-3(2)(ii)), and it asked that he be adjudged a ward of the court.

¶ 7 Along with the petition, the State filed a motion for a temporary custody order. The motion was supported by an affidavit sworn by a DCFS investigator. The investigator averred, upon information and belief, that Desiree had "committ[ed] an egregious act against another human being" and was "responsible for the death of a mother and her child." The investigator further averred that Desiree's "action and blatant disregard for human life" posed "substantial risk" to D.D. and that D.D. required placement under the circumstances because Desiree was "incarcerated and unable to care for" him. The affidavit made no mention of Luis.

¶ 8 A temporary custody hearing was held on the same day that the petition was filed. Luis attended the hearing; Desiree, who had not been provided notice, did not. The court appointed the public guardian to serve as D.D.'s attorney and guardian *ad litem*. It appointed a private attorney

to represent Luis. It granted a DCFS administrator temporary custody of D.D. Three days later, it reaffirmed the temporary custody order and appointed the public defender to represent Desiree.

¶ 9 For reasons that are not clear from the record, no hearing to adjudicate the allegations of neglect and abuse was held within the 90-day statutory limit. See 705 ILCS 405/2-14(b) (West 2020). On September 30, 2020, the parties, with the court's approval, waived the time limit. See *id.* § 2-14(d).

¶ 10 The matter proceeded to an adjudicatory hearing on November 17, 2022. At the hearing, the trial court received six exhibits that had previously been offered by the State, including records from the medical examiner related to Marlen and Yovanny, medical records from D.D.'s birth and a routine check-up five days later, payroll records from Luis's employer showing that he was not at work on the day of the killing, and electronically recorded interviews (ERIs) of Luis and Desiree related to the killing.

¶ 11 The hospital records from D.D.'s birth through his discharge are voluminous and need not be discussed in detail. The records reflect that D.D. was delivered at full term via cesarian section after an abnormal heart rate or rhythm was detected during labor. That sole complication does not appear to have led to any lingering concerns, and the records generally show that D.D. was born healthy and normal.

¶ 12 The hospital records show that, in view of Desiree's incarceration, medical personnel decided to consult with a social worker about who should care for D.D. upon discharge. The social worker contacted the DCFS hotline. After obtaining information about D.D.'s medical and social circumstances, DCFS said that there was no abuse or neglect because D.D.'s father was not a risk to D.D., was "not inappropriate" with D.D., and had no other issues, and because D.D.'s mother was "appropriate with the baby," would not be around him, and had not been convicted. DCFS therefore declined to take a report. Based on that consultation, which took place on the afternoon of November 2, 2019, hospital personnel decided to follow their normal protocol, which was to release D.D. into the care of the person designated by his mother, who was Luis. If hospital staff

either observed Luis "being inappropriate with" D.D. or found out that he posed a risk of some kind to D.D., or if they became aware of any other issues, they were to contact DCFS. The records do not show that any further concerns were raised, and D.D. was discharged into Luis's care on November 4.

¶ 13     The medical records also show that Luis brought D.D. in for a routine outpatient check-up on November 6, 2019. There is no indication that D.D. had any particular health concerns. Luis reported that D.D. was doing well and that D.D. was "not his first baby."[3] D.D. was being fed every three hours, producing eight wet diapers and approximately five bowel movements daily, sleeping on his back in a separate crib, and using a car seat. Luis had family support, and no smokers lived in the home. At Luis's request, he was given a list of clinics closer to where they lived.

¶ 14     Desiree's ERI depicted a series of interviews that took place in an interview room at Area 2 between May 14 and May 16, 2019. During the first interview, she feigned ignorance until confronted with photographs of her and Luis in Marlen's car. Desiree eventually said that Clarisa, whom she described as "mentally ill," told her that she was going to kill Marlen and take the baby. She asked Desiree to help, and Desiree refused. When Desiree told Luis what Clarisa had asked her to do, he stood up and said, in Clarisa's presence, that, if she did anything like that, he would call the police and tell Clarisa's mother, who lived upstairs. Clarisa played it off as an April Fool's Day joke. Desiree told Luis that her mother was crazy and was going to kill someone for a baby. Luis agreed and said that he had to get Desiree out of the house, but they had nowhere else to go. Clarisa later told Desiree that Marlen had agreed to give Clarisa the baby and then leave Chicago to return to Iowa. According to Desiree, on April 23, Marlen came to the house and gave Desiree

---

[3]   According to a DCFS integrated assessment report that was completed in March 2020, but not made a part of the record until it was introduced as an exhibit at the dispositional hearing in 2023, D.D. is Luis's third child. His first child died of an immunodeficiency disease at the age of two years, and his second child lived with the mother but sometimes visited Luis. There is no indication of DCFS involvement with either child.

the keys to her car and warned her that it was likely to get reported as stolen. Desiree took the keys and went to get some phones from her sister. When she returned, nobody was home, and she later learned that paramedics had come and taken the baby to the hospital. She did not learn what had happened to Marlen until May 13, when Clarisa admitted that she had cut the baby out of Marlen and put the body in a garbage can in the backyard. Feeling that she had to let Marlen's family know but unwilling to call the police on her own mother, Desiree created a Facebook account under a fake name and sent a message to one of Marlen's relatives before deleting the account.

¶ 15    Shortly before 11 p.m. on May 15, detectives questioned Desiree again after she asked to talk to them because she wanted to know what was going on. At first, she admitted that, after taking Marlen's car, she had thrown Marlen's phone out of the window, but she maintained that she had not been there when Marlen was killed. About one hour into the interview, though, she relented and agreed to tell the detectives what had happened if she could be the one to tell Luis. She admitted that she had been in the home when Marlen was killed. She told police that Clarisa told her in the kitchen what she was going to do after Marlen was already at the home, sitting on the couch. Clarisa came up from behind Marlen with a wire and put it around her neck. Desiree was supposed to hold Marlen's arms down, but she let them go, and Marlen reached up and tried to pull the wire off her neck. When Clarisa told Desiree that she was "not doing her f***ing job," Desiree pried Marlen's fingers off the wire and held her arms down. It took about four minutes to strangle Marlen. At Clarisa's direction, Desiree retrieved a blanket, a garbage bag, and a meat-cutter.

¶ 16    During a follow-up interview the next day, Desiree maintained that she was not present when Clarisa extracted the baby from Marlen's body, which happened while Desiree was retrieving the garbage bag from the downstairs. When she got back upstairs, Marlen's body was already wrapped in a blanket. She saw the umbilical cord hanging out of a bucket, and she assumed the baby was inside, but she did not want to see it. The baby was not crying, and Clarisa thought something was wrong. Desiree handed Clarisa the garbage bag, and Clarisa pulled it around the

body in the blanket, tied it, picked it up, carried it outside, and put it in the garbage can. At that point, Desiree realized that there would be paramedics coming, so she left. Later, when she picked Luis up from work, he realized that she was driving Marlen's car. When he asked what had happened to Marlen, Desiree told him—as she had been instructed to by her mother—that Marlen had gone to Iowa. Luis seemingly believed the lie. He thought the car was "hot," so he got rid of the plates and Marlen's wallet, but he did not know what had happened to her. In the days after Marlen's killing, Luis noticed something was off with Desiree and started asking her what was wrong. Not wanting to make him an accomplice by putting him in a position where he knew what had happened, she lied and said that nothing was wrong, which led them to fight.

¶ 17    Less than an hour after that interview, detectives brought Luis into the room. Desiree told him that she had helped Clarisa kill Marlen, explaining that she was afraid that Clarisa would kick them out of the house and they would have nowhere to live with the baby if she refused. While she confessed what she had done, Luis buried his head in his hands and cried.

¶ 18    Desiree's ERI also contained information about episodes of domestic violence involving Luis. She noted in passing that Luis sometimes struck her, and she said that Luis tended to get aggressive when he had not used marijuana. She also told police that, during one of the arguments they got into shortly after Marlen's killing, she decided she was going to leave him and drive to a women's shelter in Marlen's car. While she was packing, he let the air out of the car's tires so she could not leave. They resumed arguing when she came back, and Desiree shoved him away when he got too close to her. He grabbed a pair of bolt-cutters and swung them at her, but she ducked, and he hit the car window, breaking it.

¶ 19    Luis's ERI depicted his interview with police on the evening of May 15. During the interview, he denied that he knew about or was involved in planning the killing of Marlen. He told police that Marlen had come to the home a few times in the month preceding the killing to get clothes. He first met Marlen on April 1, when she picked him and Desiree up from a prenatal doctor's appointment and drove them to Clarisa's house. While they were waiting for Marlen to

arrive, Desiree told Luis that she had received a text message from Clarisa saying something to the effect that that she was about to do something dumb and prayed that God would forgive her. Marlen arrived, and she drove them all to Clarisa's house. While Marlen, Desiree, and Luis were at the house, Clarisa kept bringing Desiree into a room to talk to her. The last time Desiree came out, she was shaking. Luis warned her that if she did something dumb, he would call the police and tell Desiree's grandmother, who lived upstairs. They started to argue, so he grabbed his marijuana and went outside to smoke, telling himself that he would make sure that Marlen would come out. Marlen came out unharmed and left. She was followed by Desiree, who said, "You dumb mother***er, it was only an April Fool's joke." He was later told that Marlen had agreed to give her baby to Clarisa and then go to Iowa. On April 23, Desiree picked him up from work in Marlen's car and told him that Marlen had come with the baby and given it to Clarisa. He admitted that he had driven around in Marlen's car for a few days afterward. He said that he broke one of the car's windows when he tried to hit Desiree with a "lock turner" during an argument over her leaving, and he also admitted letting the air out of the tires. He told police that, until he was told earlier that day that a body had been found, he had assumed that Marlen was living in Iowa as she had planned.

¶ 20    Luis testified at the hearing on his own behalf. He testified that, after his birth, D.D. lived with Luis and Luis's mother in a residence other than the one that Luis had previously shared with Desiree and Desiree's mother. D.D. lived there for about a month before DCFS came and took temporary custody of him. A DCFS agent told Luis that they needed to take D.D. to the hospital "just to do a check," but they did not bring him back after taking him. Luis denied that any domestic violence had occurred between him and Desiree, but he acknowledged that they had argued a lot before D.D.'s birth and that Desiree had once called the police on him during an argument. He later went to jail for an unrelated reason. While there, he found out that a warrant had been issued against him on a domestic-violence charge, but the case was dropped at his initial appearance.

¶ 21    Apart from Luis's testimony, no evidence was presented concerning the circumstances of D.D's living situation at the time the petition for wardship was filed.

¶ 22 During closing argument, the State acknowledged that it was proceeding under a theory of anticipatory neglect. It argued that Desiree's "previous actions that led to the death of [Yovanny] is more than sufficient to demonstrate *** an injurious environment for [D.D.], as well." It also contended that, even if he did not participate in the killing, Luis at least knew about it and that Luis had admitted to engaging in conduct that, even if it did not result in injury to Desiree, still constituted domestic violence.

¶ 23 Based on the evidence, and relying on the doctrine of anticipatory neglect, the court found that D.D. was neglected in that his environment was injurious due to "the breach of a parent's duty to ensure a safe and nurturing shelter for her children." It also found that D.D. was abused because there was a substantial risk of injury to him. It identified both Desiree and Luis as responsible for that neglect and abuse. The majority of its oral findings addressed Desiree's conduct. With respect to Luis, it found as follows:

> "The petition alleges—does not allege [Luis] was actively involved in the murder of [Marlen] and the forcible surgical removal of her child in the home, but it does allege history of domestic violence. And the Court finds that there's sufficient corroboration based on mom's statement and dad's statement and Luis saying that he was actually arrested on a warrant for domestic violence but it was dismissed.
>
> I mean, it was obviously a tumultuous relationship, and the fact that while the authorities were sorting all this out that the baby lived with Luis and his mom for a month before they took protective custody is really of no import to this Court because it took a while for folks—I mean, the facts of this case boggle the mind. They are so horrific. And while it's not pled in the petition, the word that comes to this Court's mind is depravity. The depraved behavior of not only [Desiree] and her mother, but [Luis], as well, as described in their statements."

¶ 24 The dispositional hearing was held three months later, on February 6, 2023. Desiree introduced five exhibits, which were certificates from various programs she had completed while in jail. The State introduced two exhibits.

¶ 25    The State's first exhibit was an integrated assessment report prepared by DCFS in March 2020. The report, which was based on interviews and screenings conducted in January 2020, included assessments of Luis, D.D., and D.D.'s then-foster mother. Desiree was not assessed due to her incarceration.

¶ 26    Relevant to this appeal is the assessment of Luis, which made up a majority of the report. The report stated that the interviewer did not observe any safety concerns at Luis's home. Luis told the interviewer that he wanted to reunite with D.D. and was willing to participate in any services that might be recommended. He also expressed concern about D.D.'s welfare in foster care after he found a sanitary napkin in D.D.'s diaper during one visit and because D.D. was not wearing socks during the most recent visit. He said that he wanted D.D. removed from the foster home and placed with one of his relatives.[4] He also said that he thought Desiree's parental rights should be terminated.

¶ 27    The report identified several unresolved concerns that might significantly impact Luis's ability to care for D.D. First, Luis's previous romantic relationships with both Desiree and the mother of his first two children had involved constant arguments, and his relationship with Desiree had also involved being subjected to her controlling behavior and acts of domestic violence by both partners. Second, Luis apparently had knowledge of, or involvement in, Marlen's killing. Third, Luis reported significant daily marijuana use—anywhere from two to ten blunts daily depending on his stress level—dating back to the death of his first child from an autoimmune disease several years earlier, although he said that he had only used marijuana once during the month that D.D. had been in his care. Fourth, although there was no indication that Luis had ever abused a child, he scored in the top 1% for risk of future child abuse on the Child Abuse Potential

---

[4]    In addition to the concerns raised by Luis, the report noted that D.D.'s substitute caregiver had provided unsafe sleeping conditions for D.D., had difficulty estimating how much and how often D.D. was eating, and was oblivious to indications that D.D.'s development was lagging. Other material in the record suggests that D.D. was eventually removed from her care and ultimately placed with one of Luis's relatives.

Inventory. Based on his scores on various subscales and his social history, the report suggested that the elevated risk of future abuse was due to his lifelong exposure to violence, including witnessing his mother physically abuse his sister, and a rigid parenting style that could lead him to adopt fixed and unrealistic expectations for a child in his care.

¶ 28     The report concluded that the prognosis for D.D. to reunify with either of his parents was poor. With respect to Desiree, it recommended "legal screening for expedited termination of [her] parental rights given her pending homicide charges and the risk she poses to any child in her care." With respect to Luis, it noted his elevated risk for future child abuse, and it identified his knowledge of, or involvement in, Marlen's and Yovanny's deaths and his own level of functioning as "barriers to reunification" that were likely to affect his ability to safely care for D.D. The report recommended that Luis's ability to safely care for D.D. be further evaluated by having him undergo a parenting-capacity assessment and through continuing supervised visits with D.D. In the event that he was found to have the capability to effectively parent D.D., it recommended that Luis complete a variety of programs before reunifying him and D.D.

¶ 29     The State's second exhibit was a family service plan prepared by DCFS in December 2022, roughly two months before the dispositional hearing. The plan described D.D. as "a very happy three year old" who was living with a relative of Luis and her three teenage daughters. He had no contact with Desiree. Starting in September 2022, there was a plan in place for Luis to visit him twice a month, but Luis had only come to three of those visits. It noted that Luis was employed. He had completed a drug assessment in February 2021, and his "random drops" had come back negative until they prematurely ended in April 2021.[5] He had attended, but failed to fully engage in or successfully complete, a nurturing-parent program. The plan's permanency goal was for D.D. to return to Luis's care within 12 months, which would allow Luis "time to correct the behaviors

---

[5] The plan offers contradictory explanations for why random testing stopped, stating both that Luis had failed to appear and that testing had stopped during a transition to a new case-management team.

that brought his son into care." It reported that Luis had made satisfactory progress in some areas supporting that goal but unsatisfactory progress on others.

¶ 30    The author of the family service plan, DCFS social worker Abigail Lampe, testified at the hearing. Her testimony was consistent with the information found in the plan. In addition, she testified that D.D. had been placed in the care of a paternal relative for about three years. That environment was both safe and appropriate. D.D. had no developmental or health concerns, and he was attached to his caregivers, well-adjusted, and happy. Luis had participated in some, but not all, of the services that had been recommended in the integrated assessment three years earlier. Although Luis had not consistently attended scheduled in-person visits with D.D., he spoke to D.D. every week or two using FaceTime. Desiree had no contact with D.D. Lampe recommended that D.D. be made a ward of the court with a long-term goal of returning home.

¶ 31    In entering its findings orally, the court incorporated its findings from the adjudicatory hearing by reference. It first found that it was in the best interest of D.D. that he be made a ward of the court. It then turned to the appropriate disposition, starting with each of D.D.'s parents' respective ability and fitness to parent him:

> "Again the Court finds the mother is unable because of circumstances to care for, train, or discipline the minor. The mother, based on the evidence admitted on the Adjudication, and the Court finds her unfit.
>
> As to father [the] Court also finds him unable for some reasons other than financial circumstances alone to care for, protect, train, or discipline the minor based on the evidence admitted at the Adjudicatory Hearing including but not limited to the inciden[ts] of domestic violence. The Court also find him to be unfit."

It next found that there had been reasonable efforts to prevent or eliminate the need to remove D.D. from the home but that appropriate services meant to promote reunification had so far proved unsuccessful. It therefore determined that it was in the best interest of D.D. to be removed from

his parents' custody, and it placed him in the custody of the DCFS guardianship administrator. The

court also prohibited Desiree from visiting with D.D.

¶ 32    On March 7, 2023, Desiree filed a notice of appeal from the adjudicatory and dispositional

orders.[6] Luis has not appealed.

¶ 33                                                          ANALYSIS

¶ 34    On appeal, Desiree challenges the trial court's determinations at both the adjudicatory

hearing and the dispositional hearing. With respect to the adjudicatory hearing, she argues that the

trial court's findings that D.D. was a neglected minor and an abused minor were against the

manifest weight of the evidence and legally erroneous insofar as those findings rested on a theory

of anticipatory neglect. With respect to the dispositional hearing, she argues that the trial court

erred by making D.D. a ward of the court, by not articulating in writing the factual basis for its

findings that Desiree and Luis were unfit, and by entering a dispositional order that did not award

custody of D.D. to Luis. For the reasons that follow, we reject those arguments and affirm the trial

court's judgment.

¶ 35    The right of parents to raise their children "is perhaps the oldest of the fundamental liberty

interests recognized by" the United States Supreme Court. (Internal quotation marks omitted.)

*In re M.H.*, 196 Ill. 2d 356, 362 (2001) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). That

right is not interfered with lightly. *Cf. id.* (stating that courts do not "easily terminate" parental

rights). Nevertheless, "[s]tate interference with fundamental parental childrearing rights is justified

in limited instances to protect the health, safety, and welfare of children." *Wickham v. Byrne*,

199 Ill. 2d 309, 317 (2002). One way that Illinois protects the health, safety, and welfare of children

is through Article II of the Juvenile Court Act of 1987 (Juvenile Court Act), which authorizes

---

[6]    The notice of appeal was filed on March 7, 2023. The court granted multiple requests for brief
extension from the parties, and it allowed the State to file its brief *instanter*. We therefore find
that there is good cause for issuing our decision more than 150 days after the notice of appeal
was filed. See Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018).

courts to assume wardship of neglected, abused, or dependent minors. See 705 ILCS 405/2-1 *et seq.* (West 2022).

¶ 36 Article II sets out a comprehensive process for deciding whether to remove a minor from his or her parents and make the child a ward of the court based on allegations of neglect, abuse, or dependence. *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004). The State invokes that process by filing a petition for wardship alleging that a minor is abused, neglected, or dependent. See 705 ILCS 405/2-13 (West 2022). Upon filing of the petition for wardship, the court holds a temporary custody hearing where it decides whether there is probable cause to believe that the minor is abused, neglected, or dependent. If so, the court is empowered to enter appropriate orders for the care and custody of the minor pending a final resolution of the petition. See *id.* § 2-10(1). The next step in the process is an adjudicatory hearing at which the court decides whether it is more likely than not that the minor is neglected, abused, or dependent. See *id.* §§ 1-3(1), 2-21. That finding is jurisdictional. *Arthur H.*, 212 Ill. 2d at 464. A finding that the minor is not neglected, abused, or dependent ends the proceedings. *Id.* at 478. If the court does make such a finding, it proceeds to a dispositional hearing, where it decides whether being made a ward of the court is in the minor's best interest and, if so, determines what disposition would best serve the health, safety, and interests of both the minor and the public. See 705 ILCS 405/2-22, 2-23 (West 2022).

¶ 37 In evaluating this case, we are mindful of two powerful, but often competing, interests. "A proceeding for adjudication of wardship 'represents a significant intrusion into the sanctity of the family which should not be undertaken lightly.' " *Arthur H.*, 212 Ill.2d at 463 (quoting *In re Harpman*, 134 Ill. App. 3d 393, 396–97 (1985)). But at the same time, as in any proceeding under the Juvenile Court Act, the most significant factor is acting in the best interest of the child. *In re A.P.,* 2012 IL 113875, ¶ 18. This tension is reflected in the act's express purpose "to preserve and strengthen the minor's family ties whenever possible, removing him or her from the custody of his or her parents only when his or her safety or welfare or the protection of the public cannot be adequately safeguarded without removal." 705 ILCS 405/1-2(1) (West 2022).

¶ 38                                    I.  Findings of Neglect and Abuse

¶ 39      Desiree first challenges the trial court's findings at the November 2022 adjudicatory hearing that D.D. was neglected and abused. At an adjudicatory hearing, the court must "determine whether the allegations of [the] petition *** that a minor under 18 years of age is abused, neglected or dependent *** are supported by a preponderance of the evidence." 705 ILCS 405/1-3(1) (West 2022). The issue is not whether the parents are neglectful or abusive; it is whether the minor is neglected or abused. *Arthur H.*, 212 Ill. 2d at 467. It is the State's burden to prove allegations of abuse and neglect by a preponderance of the evidence. *In re A.P.*, 2012 IL 113875, ¶ 17. Cases involving accusations of neglect are *sui generis*, so they must be decided according to their particular facts. *Arthur H.,* 212 Ill. 2d at 463.

¶ 40      The parties dispute the applicable standard of review. Ordinarily, a finding that a minor is neglected or abused will be reversed only if it is against the manifest weight of the evidence. *Arthur H.*, 212 Ill. 2d at 464. Desiree, however, argues that, to the extent the trial court's findings were based on the circumstances surrounding the killing of Marlen and her infant son, review should be *de novo* because the evidence showing those circumstances was documents and video footage, not live testimony. For two reasons, we decline to review the trial court's findings *de novo*. First, we do not believe that the trial court's findings as to neglect and abuse can be neatly separated into those related to the killings and those related to domestic violence. As just noted, every case involving allegations of neglect and abuse is one-of-a-kind and must be decided based on the unique circumstances of that particular case. *Id.* at 463. Luis's live testimony was relevant to the allegation of neglect and the allegation of abuse, so this is not a case where the trial court's findings were based solely on documentary evidence. Second, unlike the cases Desiree relies on in arguing for *de novo* review, this case does not involve stipulated or otherwise undisputed facts. See *In re Zion M.*, 2015 IL App (1st) 151119, ¶ 28 (reviewing neglect finding *de novo* because it was based on a stipulated record); *Alderson v. Southern Co.*, 321 Ill. App. 3d 832, 846 (2001) (reviewing

jurisdictional determination *de novo* because there was "no material dispute regarding the facts"). When the facts are undisputed, *de novo* review is appropriate because the only dispute is about "the legal conclusions to be drawn from those facts." *Alderson*, 321 Ill. App. 3d at 846. While there was no disagreement about what is depicted on the ERI videos, for instance, the inferences to be drawn from the statements on those videos about Desiree's involvement in the killing of Marlen and about Luis's knowledge of the scheme were hotly disputed, as were the inferences about what that conduct showed concerning the likelihood of future neglect or abuse of D.D. It is not our role as a reviewing court to revisit those inferences anew. See *Best v. Best*, 223 Ill. 2d 342, 351 (2006) ("A reviewing court will not substitute its judgment for that of the trial court regarding *** the inferences to be drawn.")

¶ 41    Accordingly, we review the trial court's findings of neglect and abuse under the manifest-weight standard. A finding is against the manifest weight of the evidence "only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002). This standard is extremely deferential. When applying this standard, we must view "all of the evidence in the light most favorable to the prevailing party." *Melamed v. Melamed*, 2016 IL App (1st) 141453, ¶ 37. We may not reweigh the evidence, nor may we reverse merely because we might have entered a different factual finding. *People ex rel. Illinois Historic Preservation Agency v. Zych*, 186 Ill. 2d 267, 278 (1999). "When there are different ways to view the evidence, or alternative inferences to be drawn from it, we accept the view of the trier of fact as long as it is reasonable." *Id.* at 278. If either the finding of neglect or the finding of abuse can be upheld under the manifest-weight standard, then we will affirm. *In re Jordyn L.*, 2016 IL App (1st) 150956, ¶ 29.

¶ 42    The State's allegation that D.D. was neglected was based on section 2-3(1)(b) of the Juvenile Court Act, which deems to be neglected any minor "whose environment is injurious to his or her welfare." 705 ILCS 405/2-3(1)(b) (2022). "Child neglect is by its very nature incapable of a precise and detailed definition." (Internal quotation marks omitted.) *In re Z.L.*, 2021 IL

126931, ¶ 90 (quoting *People v. Schoos*, 15 Ill. App. 3d 964, 967 (1973)). Although "the term 'injurious environment' cannot be 'defined with particularity,' *** it includes the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children." *Id.* ¶ 89 (quoting *Arthur H.*, 212 Ill. 2d at 463). "[A] finding of an 'injurious environment' does *not* require a showing of actual harm. In other words, courts need not wait for a child to get hurt." (Emphasis in original.) *In re K.F.*, 2023 IL App (1st) 220816, ¶ 49. At the same time, our supreme court has "emphasize[d] that the State must be held to its burden of proof," meaning that "the natural ties between parents and their children may not be severed on the basis of mere speculation." *Arthur H.*, 212 Ill. 2d at 477-78. The State's second allegation, which was that D.D. was abused, was based on section 2-3(2)(ii) of the Juvenile Court Act of 1987, which provides that any minor "whose parent or immediate family member, or any person responsible for the minor's welfare, or any person who is in the same family or household as the minor, or any individual residing in the same home as the minor, or a paramour of the minor's parent *** creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function" is deemed to be abused. 705 ILCS 405/2-3(2)(ii) (West 2022).

¶ 43       The allegations that D.D. was neglected and abused rested on the same factual basis: Desiree's involvement in the deaths of Marlen and her infant son, Luis's awareness of the killing and involvement in the plot (if not the killing itself), and the incidents of domestic violence between Desiree and Luis. The State did not allege that D.D. had previously been neglected or abused. Because the factual basis for the petition pertained to events that had occurred more than six months before D.D.'s birth, the State's petition and the trial court's finding that D.D. was neglected and abused necessarily rested on a theory of anticipatory neglect. "Under the anticipatory neglect theory, the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected

or abused another child." *Arthur H.*, 212 Ill. 2d at 468. The Juvenile Court Act of 1987 provides that the proof of neglect of one minor "shall be admissible evidence" on the issue of the neglect of another minor, but such evidence is not conclusive proof of the neglect of another minor. 705 ILCS 405/2-18 (West 2023); *In re Arthur H.*, 212 Ill. 2d at 468. In other words, the neglect of one child does not establish, *per se*, that any other children in the household are also neglected. See *In re S.R.*, 349 Ill. App. 3d 1017, 1022 (2004) (holding that there was insufficient evidence to support the finding that mother's son was a neglected minor while mother's daughter was found neglected and made a ward of the court); *In re Edricka C.*, 276 Ill. App. 3d 18, 28 (1995). Like any other case, a case involving the theory of anticipatory neglect must be reviewed according to its own distinct facts. *Edricka C.*, 276 Ill. App. 3d at 28.

¶ 44     Initially, we observe that the trial court's assessment of the heinous and depraved nature of the deliberate killing of Marlen, which ultimately led to the death of her son Yovanny, was supported by the evidence. Its finding that Desiree's participation in that crime, which was patently contrary to Yovanny's welfare, showed that she could not "be trusted to care of an infant on [her] own" was entirely reasonable. But the question before the trial court was not whether Desiree was (or would be) a neglectful mother; it was whether D.D. was a neglected or abused child. *Arthur H.*, 212 Ill. 2d at 467. A parent's past neglectful or abusive actions do not establish anticipatory neglect if that parent will not be in the child's environment going forward. See *In re Zion M.*, 2015 IL App (1st) 151119, ¶ 34 (holding that theory of anticipatory neglect failed where the parent who had neglected and abused the minor's siblings was "no longer living in the home" with the minor and the mother). There is no dispute that Desiree has been in custody at the Cook County Jail since 2019, and there was no evidence presented suggesting that was likely to change any time soon. As there was no basis for finding that Desiree will be in a position to neglect or abuse D.D., her deplorable conduct with respect to Marlen and Yovanny cannot establish that D.D. is, or is likely to be, neglected.

¶ 45    Luis testified at the adjudicatory hearing that, before D.D. was taken away by DCFS, he was living with Luis and Luis's mother. That testimony went unchallenged. The trial court's task, then, was to evaluate what D.D.'s care and condition would be if left in the care of his father and paternal grandmother. *In re Zion M.*, 2015 IL App (1st) 151119, ¶ 34 ("[W]here the child is alleged to be neglected under the theory of anticipatory neglect, *** the court needs to evaluate the individual with whom the child will reside.").

¶ 46    When the State advances a theory of anticipatory neglect, whether the minor in question is neglected "should be measured not only by the circumstances surrounding [the other neglected or abused child], but also by the care and condition of the child in question." (Internal quotation marks omitted.) *Id.* at 468 (quoting *In re Edward T.*, 343 Ill. App. 3d 778, 797 (2003)). The record contains very little information about D.D.'s environment during the month of his life that he lived with his father. The only evidence presented at the adjudicatory hearing touching on his care and condition during that period of time were the medical records from D.D.'s post-discharge check-up on November 6, 2019, when he was only five days old. Those records generally show that Luis was caring for D.D. appropriately: he was being regularly fed, producing frequent wet diapers and bowel movements, being secured in a car seat when driven, and sleeping on his back in a crib. Other than that basic information suggesting that D.D.'s environment was not injurious, the record does not show one way or another the nature of D.D.'s care and condition while being cared for by Luis and Luis's mother.

¶ 47    But the absence of evidence of neglect or abuse during the one-month period that D.D. was in Luis's care and custody is not dispositive because the State's allegations and the trial court's findings relied on the theory of anticipatory neglect. That theory necessarily "concedes that the child has not been the victim of neglect or abuse." *Zion M.*, 2015 IL App (1st) 151119, ¶ 34. It is based instead on "a probability" that he will "be subject[ed] to neglect or abuse" in the future. *Arthur H.*, 212 Ill. 2d at 468. With respect to Luis, the trial court found that such a probability existed for two reasons.

¶ 48    First, although the trial court did not find that Luis had participated in the killing of Marlen, it did find that his conduct related to the killing demonstrated "depravity." In the context of child-protection proceedings, *depravity* is a term of art that means "an inherent deficiency of moral sense and rectitude." (Internal quotation marks omitted.) *In re A.M.*, 358 Ill. App. 3d 247, 253 (2005) (quoting *Stalder v. Stone*, 412 Ill. 488, 498 (1952)).[7] In finding that D.D. was neglected, the court further stated that "somebody who could do what happened to" Yovanny could not "be trusted to take care of an infant on their own." We understand this finding to apply not only to Desiree based on her direct involvement in Marlen's killing but also to Luis—whom the trial court specifically identified as a "perpetrator[] of the neglect and abuse"—in light of his actions before and after the killing. Those actions demonstrated a lack of judgment and the absence of a sense of responsibility for other human beings that would be necessary for him to discharge his duty as a parent "to ensure a safe and nurturing shelter for" D.D. See *Z.L.*, 2021 IL 126931, ¶ 89. We cannot say that the trial court's assessment of Luis's character is unreasonable, arbitrary, or not supported by evidence. Viewed in the light most favorable to the State as the prevailing party (*Melamed*, 2016 IL App (1st) 141453, ¶ 37), the evidence showed that Luis became aware that Clarisa had discussed harming Marlen and taking the baby as early as April 1, 2019. Although he made his opposition to any such plan known and warned that he would contact the authorities if Marlen was hurt, he never warned Marlen that Clarisa might be dangerous or contacted the authorities himself. Rather than physically intervening to ensure Marlen's safe departure on April 1, he went outside to smoke marijuana with the hope that she would come out of the house unharmed. On April 23, he did not go to the police when Desiree unexpectedly showed up driving Marlen's car. Instead, he accepted the highly improbable story that Marlen had decided to abandon her baby and go to Iowa without

---

[7] Depravity is usually relevant because it provides a basis for terminating parental rights based on unfitness. See 705 ILCS 405/2-29(2) (West 2022) (authorizing termination if parent is an "unfit person"); 750 ILCS 50/1(D)(i) (West 2022) (providing that depravity is a ground for finding that a parent is an unfit person). In this case, the State has not sought to terminate either Desiree's or Luis's parental rights.

her car or her wallet—an explanation that was unlikely enough to justify a belief that he was not merely gullible but willfully blind to Marlen's fate so he could take advantage of having access to the car and the money that had been left in it. The trial court's conclusion that this conduct reflected deficiencies in Luis's character, including his judgment and sense of responsibility, that made it likely he would not provide a safe and nurturing environment for his son was not an unreasonable one.

¶ 49     Second, the trial court found that Luis had a history of committing acts of domestic violence against Desiree. This finding readily finds support in the evidence. Both Luis and Desiree told police about the incident where he broke the window of Marlen's car while trying to strike Desiree with a tool of some kind. In her brief on appeal, Desiree minimizes the significance of that altercation, characterizing it as an isolated incident with no relevance to D.D. The trial court was not unjustified in finding otherwise. The evidence showed that the bolt-cutter incident was not isolated. Desiree acknowledges that she told police that Luis had pushed her on other occasions. But she also reported that Luis tended to act aggressively when not using marijuana, not only suggesting that there were additional instances of violent behavior but supporting a finding that Luis's aggressive behavior posed a substantial risk of injury to D.D. We also do not agree that the bolt-cutter incident had nothing to do with D.D. Desiree was three months pregnant when Luis tried to strike her with an object that was heavy enough to shatter a car window. That action did not merely show a willingness to harm Desiree but a disregard for the health and safety of D.D. *in utero*, which spoke to both the environment that Luis would provide and the existence of a substantial risk of injury to D.D.

¶ 50     In short, the trial court reasonably found that Luis's actions evinced a lack of the empathy, judgment, and responsibility that are required to provide a safe and nurturing environment for a child and a willingness to use physical violence against family members when upset—even at the risk of harming his own son. Viewed together, those findings supported the trial court's conclusions that, if left in Luis's care, D.D. would more likely than not be (1) neglected by being in an

"environment *** injurious to his *** welfare" and (2) abused because he faced "a substantial risk of physical injury *** by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function." See 705 ILCS 405/2-3(1)(b), (2)(ii) (West 2022). Accordingly, we hold that the trial court's findings that D.D. was neglected and that D.D. was abused were not against the manifest weight of the evidence.

¶ 51                                        II.  Disposition

¶ 52    Desiree next challenges the trial court's findings at the dispositional hearing. At the dispositional hearing, the court makes two determinations. First, it decides "whether it is in the best interests of the minor and the public that the minor be made a ward of the court." 705 ILCS 5/2-22(1) (West 2022). If the minor is made a ward of the court, it next selects "the proper disposition best serving the health, safety and interests of the minor and the public." *Id.*; see *id.* § 2-23(1)(a) (listing proper dispositions). These are distinct inquiries. See *In re M.M.*, 2016 IL 119932, ¶ 19 n.1 (stating that the wardship determination "must precede" the inquiry into the proper disposition). Here, the trial court found that it was in D.D.'s best interest to be made a ward of the court, and it selected placement with a legal guardian as the appropriate disposition. See *id.* §§ 2-23(1)(a)(2), 2-27(1)(a). Desiree challenges both determinations.

¶ 53    In general, our review of the trial court's dispositional determinations is deferential. We may reverse only if the decision is based on factual findings that are against the manifest weight of the evidence or if the disposition selected by the trial court is so clearly inappropriate that it amounts to an abuse of discretion. *In re B.S.*, 2022 IL App (2d) 220271, ¶ 32. A factual finding is against the manifest weight of the evidence "only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Eychaner*, 202 Ill. 2d at 252. The trial court abuses its discretion only if it adopts a view that no reasonable person

would take or its decision is arbitrary, fanciful, or unreasonable. *Seymour v. Collins*, 2015 IL 118432, ¶ 41.

¶ 54                                    A.  Wardship

¶ 55    Desiree first challenges the trial court's determination that it was in the best interest of D.D. that he be made a ward of the court. She argues that D.D.'s best interest would have been served by returning him to Luis's custody. We think that this argument is misplaced. As noted above, whether the minor should be made a ward of the court is a question that is distinct from the selection of an appropriate disposition. *M.M.*, 2016 IL 119932, ¶ 19 n.1. Even if the minor is made a ward of the court, placement is not the only possible disposition. See 705 ILCS 405/2-23(1)(a) (West 2022). A ward of the court may also be "continued in the custody of his or her parents" or "restored to the custody of the parent [or] parents" with DCFS oversight. See *id.* § 2-23(1)(a)(1), (3). At the wardship stage, the court is not deciding who should take custody of the minor. Instead, it is effectively determining whether it is in the minor's best interest for the court—as opposed to the parents—to make that decision.

¶ 56    Viewed in that light, the trial court's determination that the best interests of D.D. and the public at large called for it to assume wardship of D.D. was eminently reasonable. As discussed above, the court had already found that Desiree and Luis's conduct surrounding Marlen's killing and Yovanny's subsequent death reflected a deficient moral character. Even apart from that finding, the evidence that was adduced at the adjudicatory hearing gave the court reason to distrust the judgment of both Desiree and Luis. Desiree herself told detectives during one of her interviews that, without Luis to guide her, she was prone to making very bad decisions. That assessment was borne out by her decision to participate in the brutal killing of a pregnant teenager for the purpose of allowing Clarisa, whom Desiree believed was mentally ill, to raise the child as her own. As for Luis, his attempt to strike a then-pregnant Desiree with a tool heavy enough to shatter a car window showed that he was willing to place his own desire to express his emotions through violence over

the safety and well-being of D.D., justifying a belief that he was ill-suited to make crucial decisions about D.D.'s future. Luis's poor judgment in matters affecting his son was further shown by the DCFS integrated assessment report that was introduced at the dispositional hearing. Among other things, the report stated that Luis admitted that he smoked marijuana before his interview with the DCFS worker, which was self-evidently crucial to his prospects for reuniting with his son in the future, and that he appeared to be blind to how his actions affected other people and to his own deficiencies as a father. The trial court also had before it the testimony of D.D.'s caseworker, who recommended wardship. Based on this record, the trial court's decision to make D.D. a ward of the court was neither against the manifest weight of the evidence nor an abuse of discretion.

¶ 57                                    B.  Placement

¶ 58    Desiree next challenges the trial court's selection of placement with a legal guardian, which effectively transferred custody of D.D. from his parents to that guardian, as the appropriate disposition. A minor who has been made a ward of the court may be placed into the custody of a relative or some other legal custodian or guardian if the court determines that: (1) the minor's parents are unfit or either unable or unwilling "to care for, protect, train, or discipline the minor" and (2) allowing the parents to retain custody would jeopardize "the health, safety, and best interest of the minor." 705 ILCS 405/2-27(1) (West 2022). The purpose of placement "is not to terminate parental rights, but rather to decide what future actions are in the best interests of the child." *In re Madison H.*, 215 Ill. 2d 364, 374 (2005). When the State does not seek termination of parental rights, which is the case here, the court "is concerned only with placement of the minor." *Id.*

¶ 59                                1.  Parental Unfitness

¶ 60    Desiree challenges the trial court's unfitness finding on two distinct grounds. First, she argues that the trial court failed to comply with a statutory requirement that the court must articulate the factual basis for a finding of unfitness in writing. Second, she argues that the trial court's finding that Luis was unfit was against the manifest weight of the evidence.

¶ 61                              a. Requirement of Written Findings

¶ 62    Desiree contends that a remand is necessary because the trial court failed to articulate in writing the basis for its finding that she and Luis were unfit, as required by the Juvenile Court Act. See 705 ILCS 405/2-27(1) (West 2022) (requiring the trial court to "put[] in writing the factual basis supporting the determination" of unfitness); *Madison H.*, 215 Ill. 2d at 378 (remanding for trial court to enter more specific findings). Because the purpose of requiring written findings is to provide the parties with notice of the reasons for the finding and to permit appellate review of those reasons, that requirement can be satisfied by a transcript of explicit oral findings. *Madison H*., 215 Ill. 2d at 374-75. Here, the trial court did not enter a written order detailing its findings, but it did make oral findings that have been transcribed. We must therefore "examine whether the trial court's oral statement on the record in the instant matter was explicit and advised respondent of the basis for its determination." *Id.* at 377. Whether the trial court satisfied the written-findings requirement presents a question of statutory interpretation, so review is *de novo*. *Id.* at 372.

¶ 63    The trial court began its findings at the dispositional hearing by expressly incorporating by reference its findings from the adjudicatory hearing. See *supra* ¶ 23. After determining that wardship was in D.D.'s best interest, the court found that Desiree and Luis were each unfit and unable parents. With respect to Desiree, it found that she was "unable because of circumstances" and unfit based on the evidence at the adjudicatory hearing. With respect to Luis, it found that he was unable and unfit "based on the evidence admitted at the Adjudicatory Hearing including but not limited to the inciden[ts] of domestic violence." These terse findings were not ideal, but they were also not entirely generic. *Cf. Madison H.*, 215 Ill. 2d at 377-78 (holding that the trial court's oral findings were inadequate because they merely "mirror[ed] the statutory language" and articulated "no meaningful specific factual basis" for the finding of unfitness). Desiree's "circumstances" obviously referred to the fact that she was in jail and would remain in custody for the foreseeable future. The court specified Luis's history of domestic violence as part of the factual

basis for its determination. The court also incorporated by reference its findings at the adjudicatory hearing, where it found (among other things) that Desiree's and Luis's conduct demonstrated depravity and that "somebody who could do what happened to" Yovanni could not "be trusted to take care of an infant on their own." We believe that the transcript of the trial court's oral findings, including the ones it made at the adjudicatory hearing and referenced at the dispositional hearing, allows us to discern the basis on which the court found Desiree and Luis unfit and unable and, accordingly, permits an adequate review of that determination, which satisfies the purpose of the written-findings requirement. See *Madison H.*, 215 Ill. 2d at 374-75. We therefore decline to remand for the entry of a detailed written order and proceed to the merits.

¶ 64                                b. Finding that Luis Was Unfit and Unable

¶ 65    Desiree next challenges the factual basis for the trial court's finding that Luis was, in the language of the statute, "unfit or unable, for some other reason than financial circumstances alone, to care for, protect, train or discipline the minor." See 705 ILCS 405/2-27(1) (West 2022).

¶ 66    Initially, we note that Desiree does not argue on appeal that the trial court's findings that *she* was unfit and unable were erroneous; she only challenges its findings with respect to Luis. That means she has forfeited any claim that the trial court erred by finding that she was neither fit nor able. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). But it also implicates her ability to challenge the trial court's determination. In his brief, the public guardian suggests that Desiree might not have standing to challenge those determinations because they pertain to Luis's rights, not hers. As the public guardian correctly notes, however, at least one Illinois reviewing court has held that a parent has an interest in assuring that the minor's best interest is served by the court's dispositional order. *In re Al. S.*, 2017 IL App (4th) 160737, ¶ 37 (holding that a father had standing to challenge trial court's determination that allowing neglected minor to remain in the mother's custody was in the minor's best interest). The United States Supreme Court has, in fact, recognized that parents have a "fundamental liberty interest *** in the care, custody, and management of their child."

*Sontosky v. Kramer*, 455 U.S. 745, 753 (1982). We see no reason to depart from *Al. S.*, so we hold that Desiree has standing to challenge the trial court's findings that Luis was unfit and unable.

¶ 67    We begin with the trial court's finding that Luis was unfit. Although the Adoption Act specifically defines the term *unfit person* (see 750 ILCS 50/1(D) (West 2022)), the term *unfit* is not defined in the Juvenile Court Act, and case law recognizes that the two terms are not interchangeable. See *In re K.S.*, 203 Ill. App. 3d 586, 600 (1990). Because the term *unfit* is undefined for the purposes of the Juvenile Court Act, we assume that the legislature used it in its plain and ordinary sense. *Landis v. Marc Realty, L.L.C.*, 235 Ill. 2d 1, 8 (2009). In general, something is *unfit* when it is "incapable of meeting requirements or qualifications" or "not suitable." Webster's New Twentieth Century Dictionary 1996 (2d ed. 1964). When used to describe a person, *unfit* means "not having the requisite qualities or skills to undertake something competently." New Oxford American Dictionary 1844 (2001). And in the context of family law, *unfit* usually means "[m]orally unqualified" or "incompetent." Black's Law Dictionary (11th ed. 2019).

¶ 68    "At the dispositional phase, the State bears the burden of proving [unfitness] by a preponderance of the evidence." *In re B.S.*, 2022 IL App (2d) 220271, ¶ 31. Desiree advances two arguments to support her claim that the trial court's finding was erroneous. Neither has merit.

¶ 69    First, Desiree argues that the trial court disproportionately emphasized the conduct that formed the basis for the original allegations of neglect and abuse in 2019 over Luis's fitness as a parent at the time of the dispositional hearing in 2023. As discussed above, however, the trial court found that Luis's conduct before and after Marlen's death showed depravity; *i.e.*, a deficiency in his moral character that made him "unfit to have a child," at least as that term is defined in the Adoption Act. See 750 ILCS 50/1(D), (D)(i) (West 2022). It also found that Luis had a history of committing acts of domestic violence, including one incident where he placed D.D.'s welfare in jeopardy before he was born. Although another factfinder might have thought differently, we have already held that those findings were not so unreasonable as to be against the manifest weight of

the evidence. Having found that Luis was depraved and had a history of domestic violence, it was hardly unreasonable for the trial court to conclude that Luis was not fit to care for D.D.

¶ 70     Second, Desiree argues that Luis satisfied what she characterizes as DCFS's own standards for "minimum parenting skills." She does not direct our attention to either material in the record or any DCFS rules or regulations setting out such a standard. She supports her claim by citing to an opinion that, in its recitation of the facts, stated that *the trial court* in that case had "noted that [the] respondent possessed at least the minimum parenting skills because he could feed, clothe, baby-sit, and shelter the children." *In re Alicia Z.*, 336 Ill. App. 3d 476, 484 (2002). *Alicia Z.* plainly does not support Desiree's argument that any person who is able to feed, clothe, baby-sit, and shelter a child is necessarily fit. The trial court's finding that Luis was unfit, moreover, was not based on the absence of basic child-care skills. Instead, it relied on the determinations it had made about Luis at the adjudicatory hearing, which included findings that he had a history of domestic violence and had engaged in conduct indicative of depravity. The trial court could reasonably conclude that Luis's character and past conduct rendered him unfit notwithstanding his ability to provide basic elements of care. *Cf. In re Hollis*, 135 Ill. App. 3d 585, 588 (1985) ("When a parent engages in extreme or repeated cruelty, his conduct at other times is largely irrelevant.").

¶ 71     Based on the evidence admitted and the findings entered at the adjudicatory hearing with respect to Luis's character and history of family violence, we cannot say that its finding that Luis was unfit was against the manifest weight of the evidence. Because that finding was a sufficient basis on which the court could go on to consider whether placement was in D.D.'s best interest, we need not evaluate whether it properly found that Luis was also unable.

¶ 72                                        2.  Best-Interests Determination

¶ 73     Finally, Desiree argues that the trial court erred by not placing D.D. into the custody of Luis. She correctly notes that there is a constitutional presumption that a fit parent will act in the child's best interest. *In re M.M.*, 2016 IL 119932, ¶ 26 (citing *Troxel v. Granville*, 530 U.S. 57, 68

(2000) (plurality op.)). That presumption is reflected in the Juvenile Court Act, which permits placement as a disposition only if the child's parents are unfit, unable, or unwilling to provide the necessary care. See 705 ILCS 405/2-27(1) (West 2022). Here, the trial court found that Luis was not a fit parent, and that finding was not against the manifest weight of the evidence. Accordingly, there was no longer any presumption that it was in D.D.'s best interest to have Luis reassume custody. That is not dispositive, though, because the fact that the child's parents are not fit does not justify placement in and of itself. Placement is an appropriate disposition only if the trial court properly concludes that "the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents." *Id.*

¶ 74    While Desiree argues that D.D.'s best interest would have been served by returning him to Luis's custody, we think the trial court reasonably concluded otherwise. By assigning custody of D.D. to the DCFS Guardianship Administrator, who had been D.D.'s temporary custodian since December 2019, the court effectively decided that it was in the best interest of D.D. to maintain the status quo, which had him living with paternal relatives with the goal of reunifying him with Luis. In making that determination, the court was required to consider whether "appropriate services aimed at family preservation and family reunification have been unsuccessful in rectifying the conditions that have led to a finding of unfitness or inability to care for, protect, train, or discipline the minor." *Id.* § 2-27(1.5)(a). Here, it expressly found that such services had thus far proved unsuccessful. That finding was supported by the DCFS family service plan, which stated that Luis had not made satisfactory progress toward complying with random drug drops, making himself available to visit and interact with D.D., and obtaining a parenting-capacity assessment that would provide recommendations for him to follow.

¶ 75    The trial court's decision to leave the status quo in place was also consistent with the statutory factors a court must consider whenever it makes a best-interests determination. See 705 ILCS 405/1-3(4.05) (West 2022). Most obviously, leaving the current arrangement intact promoted D.D's "need for permanence," including his "need for stability and continuity of

relationships with parent figures and with siblings and other relatives." *Id.* § 1-3(4.05)(g). More importantly, the arrangement promoted D.D.'s "sense of attachments" by ensuring that he was in a home that was familiar to him, where he felt loved and secure, and where he would be guaranteed continuity of affection. *Id.* § 1-3(4.05)(d). DCFS social worker Abigail Lampe testified that D.D. was attached to his caregivers, well-adjusted to life in their home, and appeared happy. By contrast, he had never known a time in his life where he had lived with Luis, and efforts to build a bond between them had been hampered by Luis's failure to regularly attend scheduled in-person visitations.

¶ 76     The trial court's dispositional decision also promoted D.D.'s "physical safety and welfare." *Id.* § 1-3(4.05)(a). Lampe testified that she had visited the home where D.D. was living, which appeared to be safe and appropriate, and there were no safety concerns, instances of corporal punishment, or unusual incidents associated with that placement. Per the integrated assessment report, Luis's home also appeared to be safe, and the record reflects no concerns about D.D.'s welfare during the month he was in Luis's custody. That was offset, however, by Luis's history of substance abuse and his high risk for child abuse, both of which were reflected in the integrated assessment report. Concern about possible abuse was especially salient in light of Luis's history of domestic violence, including the incident where he attacked Desiree while she was pregnant with D.D.

¶ 77     Because D.D. was living with one of Luis's relatives, moreover, not returning him to Luis's custody did not come with the same downsides that a different arrangement might have engendered. It did not impair the development of his identity, and it kept his familial and cultural ties in place. *Id.* § 1-3(4.05)(b), (c). It avoided many of "the risks attendant to entering and being in substitute care," including concerns that Luis himself had noted during D.D.'s prior placement with an unrelated foster parent. *Id.* § 1-3(4.05)(i).

¶ 78     In short, the evidence before the trial court showed that D.D. was living in a home where he was safe and well-cared for by relatives with whom he had bonded. The trial court's decision

to place D.D. in the custody of the Guardianship Administrator, which enabled him to continue living in that environment, was not an unreasonable one. Accordingly, that decision was not against the manifest weight of the evidence before the court, and it was not an abuse of the discretion.

¶ 79                                      CONCLUSION

¶ 80    For the foregoing reasons, we find no error in the trial court's findings that D.D. was neglected and abused, its decision to make him a ward of the court, or its selection of placement as the appropriate disposition.

¶ 81    Accordingly, we affirm the trial court's judgment.

¶ 82    Affirmed.